## SUPERIOR COURT.

### THE MERCHANTS' BANK OF NEW-HAVEN agt. HENRY DWIGHT, JR.

Although a debt was fraudulently contracted, or an obligation fraudulently in-
curred by a defendant, yet if subsequently thereto the plaintiff, with full knowl-
edge of the fraud, settles the original debt or obligation, and enters into a new
contract with the defendant, upon different terms, and upon additional con-
sideration, in an action upon the new contract, the defendant cannot be held
to bail, merely because the original debt or obligation was fraudulently con-
tracted or incurred.   In such a case, if the debt for the recovery of which the
action is brought was not fraudulently contracted, the defendant cannot be
held to bail.

*New-York, General Term, Dec.* 1856.
*Before* OAKLEY, Ch. J., DUER, BOSWORTH, SLOSSON, HOFF-
MAN *and* WOODRUFF, *Justices.*

THIS action comes before the court on an appeal by the de-
fendant, from an order made on the 21st of October, 1856, by
Mr. Justice SLOSSON, denying a motion to vacate an order of
arrest, on which the defendant had been held to bail in the sum
of $45,000.

The action is brought against the defendant, as indorser and
guarantor of a promissory note for $38,596, dated December 1,
1853, signed " Benj. Godfrey, & Co.," payable the 1st of Jan-
uary, 1856, with interest.

The plaintiff, on or about the 19th of September, 1853, loaned
to defendant, as the agent of Benjamin Godfrey, $25,000, and
took three notes of that date, signed like the one in suit, each
payable three months after that date, and indorsed by the de-
fendant.

On or about the 14th of October, 1853, the plaintiff loaned
to defendant, as such agent, the further sum of $14,000, and
took therefor three notes, each at three months from that date,
signed and indorsed like those taken in September.

The affidavits on which the order of arrest was made tended

to show that, at the time of these loans, the plaintiff kept deposits with the defendant—he being a banker. That defendant applied for a loan. The plaintiff replied, that it could not loan to him without violating its charter, unless it withdrew the deposits he held. He answered to this,.that he could borrow money for *Capt. Godfrey*, of Illinois, a contractor, for the completion of a part of the *Alton and Sangamon* railroad.

That the two loans were made on the representation by the defendant, that he was agent of and authorized to borrow the money for Capt. Godfrey, in which representations the plaintiff confided. That the defendant represented that the paper of said Godfrey was good. There was no averment that any reliance was placed on this representation. The affidavits also tended to show that Capt. Godfrey did not sign the notes, nor know of or authorize the loans; and that he was not a member of any such firm, and that the money was not applied to his use.

The whole affidavits disclosed that the defendant had contracted with Godfrey, prior to the loans made by the plaintiff, to furnish money sufficient to complete the road, and Godfrey had transferred his property to defendant, at the time of the contract, to secure him the repayment of such moneys as he should advance, or become liable for, on Godfrey's account, and that Godfrey had fully authorized the defendant to borrow for him.

Two witnesses swore positively that Godfrey authorized one Smith to sign notes with the name signed to those discounted by the plaintiff, and for the purposes for which those were signed, and that Godfrey and Smith formed a nominal partnership in order that notes might be signed with a partnership name.

Many of the material allegations of the original affidavits were contradicted by those on which the motion to vacate was made.

It appeared, free from doubt, that the defendant failed before either of the five notes matured. After such failure, and with knowledge of it, and with express notice that Godfrey was good for nothing, the plaintiff settled with the defendant the deposit

account, and gave up the six notes discounted in September and October, and took the note in suit, with a deposit of stock in pledge, as collateral security, which stock, at the time, was undoubtedly supposed by all the parties to be ample security.

E. W. STOUGHTON, *for defendant.*
JAS. T. BRADY & LIBBEUS CHAPMAN, *for plaintiff.*

By the court—BOSWORTH, Justice.    Whether the order appealed from should be affirmed, depends upon the question, whether the defendant was guilty of a fraud in contracting the debt, or incurring the obligation for which this action is brought. The order was made and is attempted to be sustained on the ground that the affidavits and other papers show that he was guilty of such a fraud.

The defendant is sued as indorser and guarantor of a note for $38,596, dated December 1, 1853, signed " Benj. Godfrey & Co.," payable January 1, 1856, with interest.    He is not sued to recover of him a debt owing by himself as principal: but the action is brought upon an obligation incurred by him to pay the debt of a third person.    He was professing to act as agent of Godfrey at the time he made the contract, or incurred the obligation on which this action is brought.

This note was accepted as a substitute for six others held by the plaintiff, purporting to have been signed by the same parties, as makers, and which were also indorsed by the defendant. They were received by the plaintiff from the defendant, to secure the payment of money advanced by them to the defendant as the agent of Godfrey.    It is insisted, that Dwight, in order to induce the plaintiff to make such advance, and accept the eight notes, represented,

1. That he was the agent of, and had authority to borrow the money for Godfrey.

2. That the paper of said Godfrey was good.

The fraud, taking the most favorable view for the plaintiff, of the case made by the affidavits and other papers, consists in this :—

*First.* Although it may be true, that Dwight was the agent of, and had authority to borrow the money for Godfrey, yet he had no authority to issue notes for the payment of such loan, signed " Benj. Godfrey & Co. ;" that Godfrey never authorized such a copartnership name to be used for such a purpose, or to be used by Dwight for any purpose.

*Second.* That the paper of said Godfrey was not good, and that Dwight knew it at the 'time he made the representations.

*Third.* That Dwight was, in fact, greatly embarrassed at the time, and had conveyances of, or mortgages upon, all the property of Godfrey, to secure the payment of moneys advanced to and liabilities incurred for Godfrey by Dwight, to an amount largely exceeding the whole value of the entire property, and he did not disclose these facts.

In the affidavit of the plaintiff's president, on which the order was founded, there is no allegation that the plaintiff was influenced by the representation that the paper of said Godfrey was good. He states, that when the loans were made, and the six notes received, he believed they were, in fact, the genuine notes of said Godfrey. That the note in suit was received in the full belief that it was the genuine note of said Godfrey. That said loan of $25,000 would not have been made by said bank, " if there had been the slightest suspicion on the part of any of its directors that said loan was not, in fact, a loan to said Godfrey, upon his *bona fide* promissory note."

He admits, in his supplemental affidavit, that Dwight told. him, at the time of the substitution of the note in suit, for the notes previously given, that Godfrey was good for nothing. Dwight himself had then failed. The note in suit and the obligation of Dwight for its payment were, not, therefore, taken under the influence of any belief that the paper of Godfrey was itself good for anything, or that Dwight's condition was any better than subsequent events have shown it to have been. Dwight made no representations on either occasion, as to his own condition, or ability to pay.

Dwight was not guilty of any fraud in incurring the obligation for which this action is brought, unless it be true, in fact,

that the signature to the note was unauthorized by Godfrey, *Dwight* and *Smith* expressly swear that it was authorized by him. *Quintard's* affidavit of the 20th of August, 1856, tends slightly to corroborate them. We are not at liberty to say, upon the papers before us, that Dwight was not authorized to borrow the money for Godfrey, nor that it was not applied to his use, according to the agreement existing between himself and Dwight.

These facts present this question: Is a defendant, who was guilty of a fraud in incurring an obligation, which has been surrendered by the other party to the contract, after he had discovered the fraud, and who thereupon took a new obligation, in incurring which the defendant was guilty of no fraud, liable to be arrested in an action brought on the latter obligation, by reason of his fraud in incurring the first.

When a defendant is sued in an action arising on contract, to recover a debt, or a sum which he has obligated himself to pay, the Code does not authorize an arrest because the defendant was guilty of a fraud in incurring a prior and different obligation to pay the same money. To authorize an order for his arrest, he must have been guilty of a fraud, *in incurring the obligation for which the action is brought*, in which the order of arrest is made, or applied for. (*Code*, § 179, *sub.* 4.)

The fraud practiced, if any, was discovered in Nov., 1853. After that was discovered, the obligations incurred at the time the fraud was practiced were surrendered, and a new obligation taken, with full knowledge of the fraud, which new obligation did not, by its terms, mature until more than two years thereafter. On general principles, all rights and remedies consequent upon the original transaction should be deemed to have been voluntarily relinquished for the substituted contract, and the advantages expected to result from it.

The contract, or obligation on which this action is brought, was made or incurred, without any fraud being practiced to procure it. It was accepted as a settlement of the transaction, in respect to which the alleged fraud was practiced, and with

full knowledge of it. I think this ground sufficient to require a reversal of the order appealed from.

It is certainly doubtful, whether the plaintiff was influenced, in making the loan, in the slightest degree, by any belief in the pecuniary ability of Godfrey. The relations existing at the time between the plaintiff and Dwight, and the confidence they evidently reposed in his responsibility and integrity, strongly indicate that they would have loaned to him, had not their charter prohibited it. And that they made the loan on the faith that Godfrey was the principal in the transaction, and because they were entirely satisfied with the responsibility of Dwight and the sufficiency of the collateral securities pledged for the repayment of the loan. We may fairly conclude that Dwight, at the time, believed that he would succeed in raising money enough to complete the road, and that the enterprise would result in securing to him a large fortune.

The case, therefore, is not free from doubt, as to the existence of any actual fraudulent intent, in procuring the loan. But, however that may be, as that transaction was settled by the parties to it, with knowledge of all the fraud which is proved to have been practiced, and the obligation on which this action is brought was given on that settlement, and as the defendant was guilty of no fraud in incurring the latter obligation, the order appealed from should be reversed. But as a condition to the entry of this order, the defendant must stipulate not to bring any action by reason of his arrest under said order.